1  **LYNCH CARPENTER, LLP**
   (Eddie) Jae K. Kim (SBN: 236805)
2  ekim@lcllp.com
   Tiffine E. Malamphy (SBN 312239)
3  tiffine@lcllp.com
   117 E Colorado Blvd, Ste 600
4  Pasadena, CA 91105-3712
   Telephone:    (213) 723-0707
5  Facsimile:    (858) 313-1850

6  Kelly K. Iverson (*pro hac vice forthcoming*)
   kelly@lcllp.com
7  1133 Penn Ave., 5th Floor
   Pittsburgh, PA 15222
8  Telephone:    (412) 322-9243
   Facsimile:    (412) 231-0246

9
   *Attorneys for Plaintiff*
10

11              **UNITED STATES DISTRICT COURT**

12              **EASTERN DISTRICT OF CALIFORNIA**

13  MARISELA MEDINA,                     | Case No.

14              Plaintiff,               | **COMPLAINT AND DEMAND FOR**
                                          | **JURY TRIAL**
15       v.

16  PFIZER, INC., PHARMACIA & UPJOHN
    CO. LLC; AND PHARMACIA LLC
17
                Defendants.
18

19

20       Plaintiff, Marisela Medina, by and through her undersigned counsel, brings this civil action

21  against Defendants for personal injuries and damages suffered by Plaintiff, and alleges upon

22  information and belief as follows:

23                      **I.    NATURE OF THE ACTION**

24       1.    This is an action for damages related to Defendants' development, manufacturing,

25  marketing, and distribution of medroxyprogesterone acetate ("MPA"), more commonly known by

26  Defendant Pfizer's trade name, Depo-Provera® ("Depo-Provera").

27       2.    Depo-Provera is a synthetic progesterone hormone injection prescribed for several

28  indications, including endometriosis, hormone replacement, and prevention of uterine and cervical

                                      1

cancers. The most common use of Depo-Provera in the United States is as an injectable contraceptive administered intramuscularly by a medical professional once every three months.

3.    Medical researchers have known for decades of a plausible biological mechanism to associate progesterone and its synthetic analogue progestin—the primary active ingredient in Depo-Provera—with increased incidences of intracranial meningioma.

4.    Recent medical studies have confirmed that Depo-Provera, when prescribed and administered as an intramuscular injection, causes a dramatic increase in the incidence of intracranial meningioma, *i.e.* brain tumors.

5.    Intracranial meningioma, even when benign, typically causes a range of painful and debilitating physical symptoms and requires invasive surgical treatment. Moreover, up to twenty percent of intracranial meningioma cases become malignant and can metastasize, presenting risk to other regions of the body.

6.    The risk of intracranial meningioma is particularly high for consumers who take Depo-Provera injections for more than a year, *i.e.* at least four doses of the drug.

7.    Defendants knew or should have known for decades that Depo-Provera, when prescribed and administered as intended, can cause or substantially contribute to the development of meningiomas.

8.    Despite this knowledge, Defendants continued to manufacture, market, promote, distribute, and sell Depo-Provera to the public, and moreover failed to warn or otherwise inform Depo-Provera users and health care providers about the risk of intracranial meningioma or reasonable steps to minimize such risk.

9.    Plaintiff Marisela Medina was prescribed and received Depo-Provera over the course of approximately eight years.

10.    Depo-Provera injured Plaintiff by causing, or substantially contributing to, the development of an intracranial meningioma, *i.e.* a brain tumor, which required Plaintiff to undergo significant and invasive treatment and has resulted in serious, painful, and debilitating injuries.

11.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff was injured and suffered damages from her use of Depo-Provera.

COMPLAINT AND DEMAND FOR JURY TRIAL

12.    Plaintiff therefore demands judgment against Defendants and requests compensatory damages, statutory damages, punitive damages, attorneys' fees, and costs.

## II.    **PARTIES**

13.    Plaintiff Marisela Medina is a natural person who is a resident and citizen of Bakersfield, California. Plaintiff is a citizen of California.

14.    Defendant Pfizer, Inc. ("Pfizer") is a corporation organized under Delaware law with its primary place of business in the borough of Manhattan, New York. Pfizer is a citizen of Delaware and New York. Pfizer has a registered agent for service of process, CT Corp., at 330 North Brand Boulevard in Glendale, California.

15.    Defendant Pharmacia & Upjohn Co., LLC ("Pharmacia & Upjohn") is a corporation organized under Michigan law with its primary place of business in Kalamazoo, Michigan. Pharmacia & Upjohn is a citizen of Michigan. Pharmacia & Upjohn has a registered agent for service of process, CT Corp., at 330 North Brand Boulevard in Glendale, California.

16.    Defendant Pharmacia, LLC ("Pharmacia") is a corporation organized under Delaware law with its primary place of business in Peapack, New Jersey. Pharmacia has a registered agent for service of process, CT Corp., at 820 Bear Tavern Road, West Trenton, New Jersey.

17.    Defendant Pfizer is the current New Drug Application ("NDA") holder for Depo-Provera and has solely held the NDA for Depo-Provera since 2020. Upon information and belief, Pfizer has effectively held the NDA since at least 2002 when it acquired Pharmacia & Upjohn—who then held the NDA—as a wholly owned subsidiary. No later than 2003 did Pfizer's name appear on the label alongside Pharmacia & Upjohn.

18.    At all relevant times, Defendant Pharmacia & Upjohn was a wholly owned subsidiary of Defendant Pfizer until Upjohn was spun off in a merger in 2020 to create a new company, Viatris, and the remnant, i.e., Defendant Pharmacia, was retained by Pfizer.

19.    All Defendants do business in California by, among other things, distributing, marketing, selling, and/or profiting from Depo-Provera in California, as well as throughout the United States.

COMPLAINT AND DEMAND FOR JURY TRIAL

20.    At all relevant times, Defendants were, and still are, pharmaceutical companies involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Depo-Provera, in California, and throughout the United States.

### III.    JURISDICTION AND VENUE

21.    This Court has personal jurisdiction over all Defendants. All Defendants regularly conduct business activities in California, and thus purposefully avail themselves of California law. Plaintiff's claims arise directly from the Defendants' specific activities in California, i.e. Defendants' marketing, promoting, selling, and distributing Depo-Provera.

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Complete diversity exists because Plaintiff is a citizen of California and Defendants are citizens of Delaware, Michigan, New Jersey, and New York. The amount in controversy in this matter exceeds $75,000.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district. Namely, Plaintiff obtained a prescription for Depo-Provera, purchased and used Depo-Provera, and suffered and was treated for physical injuries related to her use of Depo-Provera in this district.

### IV.    FACTUAL ALLEGATIONS

#### Plaintiff's Experience

24.    In or around 1994, at the age of 23, Plaintiff Marisela Medina was first prescribed and administered Depo-Provera for contraception by her gynecologist.

25.    Plaintiff regularly received Depo-Provera injections from approximately 1994 to 2002 in accordance with her physicians' prescriptions, which amounts to roughly thirty-two (32) injections.

26.    Based on the time frame and Plaintiff's location, these injections could only have been brand-name Depo-Provera manufactured by Defendant Pharmacia & Upjohn—prior to its acquisition by Pfizer in 2002—and Defendant Pfizer thereafter. The named Defendants were the only manufacturers of Depo-Provera at this time.

COMPLAINT AND DEMAND FOR JURY TRIAL

27.    At all relevant times, Defendants represented to Plaintiff that Depo-Provera was safe and suitable for the purpose of contraception. Defendants made these representations on the product label, packaging, patient inserts, and advertising.

28.    Plaintiff relied on Defendants' representations about the safety and suitability of Depo-Provera when she elected to use it.

29.    At all relevant times, Defendants represented to the health care providers who prescribed and administered Depo-Provera to Plaintiff (collectively, "Medical Providers") that Depo-Provera was safe and suitable to prescribe to patients for contraception. Defendants made these representations on the product label, packaging, patient inserts, and advertising. Upon information and belief, Defendants also made these representations in promotional materials specifically targeted to health care professionals.

30.    Upon information and belief, Plaintiff's Medical Providers relied on Defendants' representations about the safety and suitability of Depo-Provera when they prescribed and administered Depo-Provera to Plaintiff.

31.    Over time, Plaintiff began to develop painful and debilitating symptoms including headaches, vertigo (dizziness), memory loss, muscle weakness and paralysis, loss of sense of smell, hearing loss, and issues with her vision.

32.    In late December 2015, Plaintiff went to the Kaweah Health Center ("Kaweah") in Visalia, California, seeking treatment for severe headaches, facial numbness, and numbness in her arms and legs.

33.    The treating physician at Kaweah ordered an MRI, which revealed a ten-millimeter mass contiguous to the medial aspects of Plaintiff's left temporal lobe. This mass was identified as a benign meningioma.

34.    The temporal lobes are areas on either side of the brain that are responsible for storing memories, regulating emotions, understanding language, and processing sensory perceptions. Because the temporal lobes regulate so many crucial abilities, impairment of temporal lobe function, such as by

pressure exerted by a contiguous intracranial meningioma, can cause an "extensive" array of serious neurological symptoms that must be monitored.[1]

35.　Consistent with the advice and opinion she received at the time of diagnosis, Plaintiff has regularly monitored the status of her meningioma for the past nine years.

36.　Plaintiff receives annual MRIs to monitor the status and progression of her condition.

37.　Even though Plaintiff's meningioma has not metastasized into a more dangerous form that necessitates invasive surgery or other aggressive treatments such as radiation or chemotherapy, Plaintiff continues to suffer severe and debilitating symptoms.

38.　Plaintiff suffers from consistent headaches which are so severe that Plaintiff has difficulty sleeping. Plaintiff also experiences paresthesia, *i.e.* a tingling numbness in her head.

39.　Plaintiff routinely takes medication to treat her headaches, but her pain is occasionally so severe that she has sought treatment at a hospital. On a few occasions, Plaintiff has received morphine to treat her headaches, but typically requests alternative pain relief—when available—to avoid morphine's unpleasant side effects.

40.　Because of the severity of Plaintiff's symptoms, Plaintiff has been unable to work full-time since being diagnosed. Plaintiff is able to work for roughly three months each year.

41.　Plaintiff must continue to monitor her condition indefinitely, including by incurring expenses for medical appointments and diagnostic tests, to ensure that her meningioma does not develop into a severe and life-threatening condition.

42.　Plaintiff was unaware until recently that the Depo-Provera she took for eight years had any connection to meningioma.

**Intracranial Meningioma**

43.　An intracranial meningioma is a medical condition where a tumor grows in the meninges, the protective membrane that surrounds the brain and spinal cord just inside the skull.

44.　Around eighty percent of meningiomas remain benign, *i.e.*, they are not cancerous and do not spread from the origin site to other parts of the body. However, even when a meningioma is

---

[1] *See, e.g., Temporal Lobe*, Cleveland Clinic, https://my.clevelandclinic.org/health/body/16799-temporal-lobe#conditions-and-disorders (accessed Nov. 21, 2024).

COMPLAINT AND DEMAND FOR JURY TRIAL

benign, the constant pressure it applies to the surrounding brain tissue can cause multiple severe, painful, and debilitating physical symptoms by pressing constantly against brain tissue.

45.    Physical symptoms can vary based on the precise location of the meningioma and the specific bodily functions regulated by the adjacent brain tissue. The most common symptoms of meningioma are headaches, seizures, blurred vision or vision loss, hearing loss, weakness and numbness, memory loss, changes in personality and behavior, and speech difficulties.

46.    Additionally, up to twenty percent of meningiomas become malignant. These meningiomas grow quickly and can metastasize, *i.e.*, spread cancer to other parts of the brain and throughout the body.

47.    Meningiomas are rarely diagnosed before a patient begins to show symptoms. When symptoms indicate the possibility of a meningioma, an MRI or CT scan of the brain can detect the tumor and determine its location and size. To determine whether a meningioma is benign or malignant, a neurosurgeon performs a biopsy, by drilling into the patient's skull in order to extract a piece of tissue from the tumor.

48.    Invasive surgery to remove the tumor is the usual course of treatment for patients with malignant meningioma, or patients whose benign meningioma is causing severe symptoms such as seizures, blurred vision, hearing loss, weakness or numbness in limbs, or severe headaches.

49.    To remove meningioma, neurosurgeons first perform a craniotomy, *i.e.* remove a piece of bone from the skull near the location of the tumor. The surgeon then removes as much of the tumor as possible, before replacing the bone that was removed in the craniotomy.

50.    When surgical removal of a benign meningioma is required, the surgery presents further risks to patients including brain swelling, injury to cranial nerves, fluid buildup around the brain, and damage to brain tissue.

51.    Meningiomas may also develop near, or grow into, extremely sensitive areas of the brain. In many cases, the risks of damage to brain tissue is too high for the meningioma to be removed surgically. Instead, patients typically undergo radiation therapy to shrink the tumor and kill malignant cells.

**Depo-Provera**

52.     Medroxyprogesterone acetate ("MPA") is a progestogen, *i.e.* a synthetic drug that mimics the effects of progesterone, a female sexual hormone. MPA is used as medication for several indications, including contraception, hormone replacement, and prevention of uterine and cervical cancers. MPA may be administered orally or as an injection into the muscle ("intramuscular") or just beneath the skin ("subcutaneous"). MPA administered through either intramuscular or subcutaneous injection is called "depot MPA" ("DMPA").

53.     DMPA was developed by Upjohn, later acquired by Defendant Pfizer, in the 1950s. Upjohn filed a New Drug Applications ("NDA") with the Food & Drug Administration ("FDA") in 1967, seeking approval to market DMPA as a contraceptive.

54.     The FDA rejected Upjohn's first NDA in 1967 and rejected two more NDAs in 1978 and 1983.

55.     On its fourth application in 1992, Upjohn received the NDA for DMPA use as a prescription contraceptive and began marketing the drug as Depo-Provera in the United States.

56.     Depo-Provera and its generic equivalents are 150 mg/mL dosages of DMPA that are delivered via intramuscular injection every three months.

57.     Defendant Pfizer subsequently acquired Upjohn's NDA and continued marketing the drug as Depo-Provera for use as an injectable contraceptive.

58.     On the Depo-Provera label, Pfizer represents that injectable contraceptives like Depo-Provera are, along with sterilization, the most effective contraceptive methods available.

59.     Depo-Provera, along with its generic equivalents, are currently used as a contraceptive by up to 25 percent of women in the United States aged 18 to 49.

60.     Defendant Pfizer also produces Depo-SubQ Provera 104 ("SubQ-104"), a DMPA product that is administered subcutaneously and with a lower dose of DMPA.

61.     Injections given intramuscularly, like Depo-Provera, are absorbed by the body at much faster rates than injections given subcutaneously, like SubQ-104.

62.     Moreover, studies have shown that 150 mg Depo-Provera administered intramuscularly causes a spike in blood serum levels of DMPA that is more than four (4) times higher than the peak

8

blood serum concentration of DMPA when that same shot is given subcutaneously.[2] The same studies indicate that Depo-Provera, if administered subcutaneously, has a similar pharmacokinetic profile to SubQ 104.[3]

63.    SubQ-104, if it had been designed and approved for subcutaneous use, would be a lower dose alternative to Depo-Provera.

64.    Depo-Provera, if designed and approved for subcutaneous use in its 150 mg dosage, would also have been a lower dose alternative to the version of that Defendants currently market as an injectable contraceptive.

### Progesterone and Meningioma

65.    Medical researchers have known for decades that women have a higher incidence of meningioma than men and that there exists a biologically plausible link between progesterone and intracranial meningioma.

66.    The biologically plausible link between progesterone and intracranial meningiomas has been known in the scientific community since at least 1983, when researchers discovered a high number of progesterone receptors on meningioma cells, especially as compared to estrogen receptors.[4]

67.    The same researchers published an article in 1989, demonstrating that meningioma cell growth was significantly reduced by exposure to mifepristone, an antiprogestrone agent.[5] The 1989 study provided further support for a link between progesterone and meningiomas.

68.    Numerous studies published in the decades since the 1980s have presented similar findings on the correlation between progesterone and the incidence and growth of meningioma. Studies that have explored the effects of antiprogesterone agents have found that their use is negatively correlated with meningioma size and frequency.[6]

---

[2] *See* Shelton, et al., *Subcutaneous DMPA: a Better Low Dose Approach*, 89 Contraception 341 (2014).

[3] Shelton at 342.

[4] *See* Blankenstein, et al., *Presence of Progesterone Receptors and Absence of Oestrogen Receptors in Human Intracranial Meningioma Cytosols*, 19 Eur. J. Cancer & Clinical Oncology 365 (1983).

[5] *See* Blankenstein, et al., *Effects of Steroids and Antisteroids on Human Meningioma Cells in Primary Culture*, 34 J. Steroid Biochemistry 419 (1989).

[6] *See, e.g.,* Grunberg, et al., *Treatment of Unresectable Meningiomas with the Antiprogesterone Agent Mifepristone*, 74 J. Neurosurgery 861 (1991); *see also* Matsuda, et al., *Antitumor Effects of*

69.     During the same time period, studies that have explored the effects of progesterone and progestins have found they are positively correlated with meningioma size and frequency.[7]

70.     The extensive body of research exploring the relationships between antiprogesterone agents, progesterone levels, progestin-based medications, and meningioma size and frequency, were well known to pharmaceutical manufacturers like Defendants, who have the scientific and technical expertise required to research, develop, design, produce, market, distribute and sell progesterone or progestin-based prescription medications.

71.     Conversely, this body of research was unknown and inaccessible to Plaintiff and her Medical Providers, who lack scientific and technical expertise in biomedical and pharmaceutical research.

72.     Defendants thereby have had an unassignable duty since at least the 1980s to investigate the foreseeable potential that a high dose synthetic progesterone delivered in the deep tissue, like Depo-Provera, could cause or substantially contribute to the growth of intracranial meningioma. Defendants were also best positioned to perform such investigations in the regular course of their biomedical and pharmaceutical research. If Defendants had performed this investigation, they would have discovered that Depo-Provera was associated with a substantial increased risk of meningioma and could have informed physicians and patients of this risk.

73.     Instead, Defendants failed to investigate links between Depo-Provera and meningioma, even though decades of medical research indicated that links were foreseeable or even probable.

74.     Indeed, recent studies have shown that use of Depo-Provera for more than a year—*i.e.* four quarterly injections—is associated with increased incidences of intracranial meningioma.

---

*Antiprogesterones on Human Meningioma Cells In Vitro and In Vivo*, 80 J. Neurosurgery 527 (1994); *see also* Cossu, et al., *The Role of Mifepristone in Meningiomas Management: A Systematic Review of the Literature*, Biomedical Rsch. Int'l 267831 (2015), https://doi.org/10.1155/2015/267831.

[7] *See, e.g.*, Gil, et al., *Risk of Meningioma Among Users of High Doses of Cyproterone Acetate as Compared with the General Population: Evidence from a Population-Based Cohort Study*, 72 Brit. J. Clinical Pharmacology 965 (2011); Bernat, et al., *Growth Stabilization and Regression of Meningiomas after Discontinuation of Cyproterone Acetate: a Case Series of 12 Patients*, 157 Acta Neurochirurgia 1741 (2015); Kalamarides, et al., *Dramatic Shrinkage with Reduced Vascularization of Large Meningiomas After Cessation of Progestin Treatment*, 101 World Neurosurgery 814 (2017).

75.     A 2022 study in the journal *Endocrinology* reported a clear association between the progestin cyproterone acetate ("CPA") and meningiomas. This relationship was "dose-dependent," *i.e.*, meningiomas were "more common with a longer duration of treatment."[8]

76.     A similar direct link between Depo-Provera and meningioma was reported in 2023, when researchers published a case series in the *Journal of Neurological Surgery Part B: Skull Base*. This article studied individuals treated for meningioma at the University of Pittsburgh Medical Center between 2014 and 2021, and reported a "clear progestin meningioma syndrome associated with chronic DMPA [Depo-Provera] use."[9]

77.     In March 2024, the French National Agency for Medicines and Health Products Safety published a national case-control study ("*Roland* study") in the British Medical Journal (BMJ). The *Roland* study assessed the risk of intracranial meningioma associated with the use of selected progestogens, including injectable medroxyprogesterone acetate, *i.e.* DMPA.[10]

78.     The *Roland* study noted that concerns over meningiomas associated with high dose progestogen medications resulted in the recent discontinuation of three such medications in France and the EU. Specifically, there were "postponements in the prescription of chlormadinone acetate, nomegestrol acetate, and cyproterone acetate, following the French and European recommendations to reduce the risk of meningioma attributable to these progestogens in 2018 and 2019."[11]

79.     The *Roland* study analyzed 18,061 cases of women undergoing surgery for intracranial meningioma between 2009 and 2018. The study found that the use of injectable MPA [Depo-Provera] for longer than one year increased the risk of intracranial meningioma by 555 percent.[12]

---

[8] Hage, *Estrogen and Progesterone Therapy and Meningiomas*, 163 Endocrinology 1 (2022).

[9] Abou-Al-Shaar et al,, *Skull Base Meningiomas as Part of a Novel Meningioma Syndrome Associated with Chronic Depot Medroxyprogesterone Acetate Use*, 84 J. Neurological Surgery B: Skull Base S1 (2023), BMJ, Vol. 384, Mar. 27, 2024, https://doi.org/10.1055/s-0043-1762201 (last accessed Oct. 30, 2024).

[10] Roland et al,, *Use of Progestogens and the Risk of Intracranial Meningioma: National Case-Control Study*, BMJ, Vol. 384, Mar. 27, 2024, https://doi.org/10.1136/bmj-2023-078078 (last accessed Oct. 29, 2024).

[11] Roland et al. at 9.

[12] Roland et al. at 1.

80.    The study authors also noted that Depo-Provera is "often administered to vulnerable populations," *i.e.*, lower-income women who have no other choice but to take subsidized, inexpensive, or easily administrable medication options to prevent pregnancy and/or treat endometriosis.[13]

81.    The *Roland* study also examined the effect of several other progestogen-based medications. Several medications showed increased risk of intracranial meningioma, with Depo-Provera having the second highest increased risk, surpassed only by CPA, which is not approved for use in the United States and has been withdrawn from the market in the EU due to its association with meningioma.

82.    Depo-Provera had by far the highest risk of meningioma surgeries amongst progesterone contraceptive products studied, rendering Depo-Provera more dangerous than other drugs and treatment options designed to prevent pregnancy due to the unreasonably increased risk of injury associated with intracranial meningioma, including but not limited to headaches, seizures, vision, hearing, and memory problems, and even death.

83.    Further, the *Roland* study found that an increased duration of exposure led to even greater risk, noting the results show that excess risk associated with prolonged use was higher than that measured for short term exposure.

84.    In September 2024, a study in the journal *Cancers* (the "*Cancers* study") further developed the growing body of research into the alarming links between Depo-Provera and meningioma using a large data set collected in the United States between 2006 and 2022. The *Cancers* study supported the findings of prior published research, finding that the use of DMPA is associated with an increased risk of meningioma.[14]

85.    Like the prior published research, the *Cancers* study found a dose-dependent relationship between Depo-Provera and meningioma. Patients who received Depo-Provera injections for under a year, *i.e.* three or fewer injections total, faced a 23 percent higher risk of meningioma as compared to the control group of patients who were never exposed to Depo-Provera.

---

[13] Roland et al. at 11.

[14] Griffin, *The Association between Medroxyprogestrone Acetate Exposure and Meningioma*, 16 Cancers (2024), https://doi.org/10.3390/cancers16193362 (last accessed Oct. 30, 2024).

COMPLAINT AND DEMAND FOR JURY TRIAL

86.     Meningioma risks escalated dramatically for patients in the *Cancers* study who were exposed to the drug for more than three years, *i.e.* at least twelve injections. This group of patients faced a 150 percent higher risk than the control group. In other words, patients who took Depo-Provera for just three years—far less than Plaintiff's eight years of treatment—were two and a half times more likely than the control group to develop meningioma.[15]

87.     The *Cancers* study noted that "[t]hough meningiomas are often benign . . . the first line of treatment is often surgery, and the meningiomas can decrease the quality of life through impaired neurologic function and potential for malignant behavior, particularly following surgery."[16]

**Failure to Inform Users in the U.S.**

88.     The aforementioned medical literature demonstrates that a causal link between progesterone and meningioma is biologically plausible, and that high dose progestin medications, including Depo-Provera, are associated with increased levels of meningioma. Despite this evidence, Defendants have still made no change to Depo-Provera labels in the United States related to intracranial meningioma.

89.     Further, Defendants have failed to take any steps to otherwise warn the medical community and Depo-Provera users of these significant health risks.

90.     Defendant Pfizer has changed the label in the EU and the UK and potentially in other countries. Specifically, Defendants' Depo-Provera label in the EU now contains the following addition under the section titled "Special warnings and precautions for use": "Meningioma: Meningiomas have been reported following long term administration of progestogens, including medroxyprogesterone acetate. Depo-Provera should be discontinued if a meningioma is diagnosed. Caution is advised when recommending Depo-Provera to patients with a history of meningioma."

91.     Additionally, Defendants' Package Leaflet in the EU which provides information for the patient states that "before using Depo-Provera[,]... it is important to tell your doctor or healthcare professional if you have, or have ever had in the past ... a meningioma (a usually benign tumor that forms in the layers of tissue that cover your brain and spinal cord)."

---

[15] Griffin at 6.

[16] Griffin at 9.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

92.     Nothing was or is stopping Defendants from adding similar language to the label and package insert for Depo-Provera in the United States. Under 21 C.F.R. § 314.70, Defendants could make "moderate changes" to the label without seeking prior FDA approval. These "moderate changes" expressly include updates "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(6)(iii).

93.     Defendants could have also instructed physicians to consider a safer alternative design, specifically a lower dose medroxyprogesterone acetate injected subcutaneously. Studies going back at least ten years have shown that the 150 mg dose of Depo-Provera—when administered subcutaneously, instead of intramuscularly—is absorbed by the body at a similarly slower rate as the lower dose 104 mg Depo-SubQ Provera 104 version. Nevertheless, Defendant never produced a 150 mg subcutaneous version.

94.     Knowing that the lower dose Depo-SubQ Provera 104 was equally effective, Defendants could have alerted health care providers, including Plaintiff's Medical Providers, that a safer alternative product existed.

95.     The "lowest effective dose" is a well-known concept in the field of pharmaceutics wherein a drug-maker should seek to find the lowest possible dose at which the drug of interest is efficacious for the intended use, as any additional dosage on top of that lowest effective dose is inherently superfluous and can increase the risk of unwanted side effects.

96.     Either change—adding a warning about the risk of meningioma based on "newly acquired information" or advising physicians to consider a switch to subcutaneous Depo-SubQ Provera 104—either on its own or taken together, would have constituted a "moderate change" or changes justifying a simple CBE supplement that Defendants could have effectuated immediately, and then simply notified the FDA thereafter. Yet, Defendants have failed to do so, and that failure continues to date.

97.     Defendants ignored reports from patients and health care providers throughout the United States which indicated that Depo-Provera failed to perform as intended. Defendants also knew or should have known of the effects associated with long term use of Depo-Provera, which led to the severe and debilitating injuries suffered by Plaintiff and numerous other patients. Rather than

14

conducting adequate testing to determine the cause of these injuries for which it had notice or rule out Depo-Provera's design as the cause of the injuries, Defendants continued to falsely and misleadingly market Depo-Provera as a safe and effective prescription drug for contraception and other indications.

98.     Depo-Provera was at all times utilized by and prescribed to Plaintiff in a manner foreseeable to Defendants, as Defendants generated the instructions for use for Plaintiff to receive Depo-Provera injections.

99.     Plaintiff and her Medical Providers foreseeably used Depo-Provera, and did not misuse or alter Depo-Provera in an unforeseeable manner.

100.    Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and her physicians the true and significant risks associated with Depo-Provera use.

101.    As a result of Defendants' actions, Plaintiff and her Medical Providers were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

102.    Plaintiff did not discover the risks of Depo-Provera, and through reasonable care and diligence could not have discovered such risks, until a date within the applicable statute of limitations for filing Plaintiff's claims.

103.    As a direct result of being prescribed and consuming Depo-Provera, Plaintiff has been permanently and severely injured, having suffered serious consequences.

104.    As a direct and proximate result of her Depo-Provera use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, along with economic loss including past and future medical expenses.

**Application of the Discovery Rule**

105.    Until 2024, Plaintiff had no reason to suspect, and did not suspect, that there was any association between Depo-Provera and increased incidences of intracranial meningioma.

106.    Until 2024, Plaintiff had no reason to suspect, and Plaintiff did not suspect, that her intracranial meningioma was wrongfully caused.

107.   Plaintiff learned of the *Roland* and *Cancers* studies, and of the proven association between Depo-Provera and intracranial meningioma, for the first time in late 2024 when she saw notices posted by attorneys.

108.   Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with medical providers, the nature of Plaintiff's injuries and damages and their relationship to Depo-Provera was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

### Equitable Tolling of the Statute of Limitations

109.   Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold information from Plaintiff, her Medical Providers, and the general public concerning the known hazards associated with the use of, and exposure to, Depo-Provera, particularly over extended periods of time.

110.   Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold safety-related warnings from the Plaintiff, her Medical Providers, and the general public concerning the known hazards associated with the use of, and exposure to, Depo-Provera, particularly over extended periods of time.

111.   Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to withhold instructions from the Plaintiff, her Medical Providers, and the general public concerning how to identify, mitigate, and/or treat known hazards associated with the use of, and exposure to, Depo-Provera, particularly over extended periods of time.

112.   The aforementioned studies reveal that discontinuing use of high dose progesterone and progestin, including Depo-Provera, can retard the growth of meningiomas, but failed to warn the medical community and the Plaintiff of this method to mitigate the damage of a developing meningioma.

113.   Defendants willfully, wantonly, and intentionally conspired, and acted in concert, to ignore relevant safety concerns and to deliberately not study the long-term safety and efficacy of Depo-Provera, particularly in chronic long-term users of Depo-Provera.

114.    Defendants failed to disclose a known defect and, instead, affirmatively misrepresented that Depo-Provera was safe for its intended use. Defendants disseminated labeling, marketing, promotion and/or sales information to Plaintiff, her Medical Providers, and the general public regarding the safety of Depo-Provera knowing such information was false, misleading, and/or inadequate to warn of the safety risks associated with long-term Depo-Provera use. Defendants did so willfully, wantonly, and with the intent to prevent the dissemination of information known to them concerning Depo-Provera's safety.

115.    Further, Defendants actively concealed the true risks associated with the use of Depo-Provera, particularly as they relate to the risk of serious intracranial meningioma, by affirmatively representing in numerous communications, which were disseminated to Plaintiff and her Medical Providers, and which included, without limitation, the Package Insert and the Medication Guide, that there were no warnings required to safely prescribe and take Depo-Provera and no intracranial meningioma-related adverse side effects associated with use of Depo-Provera.

116.    Due to the absence of any warning by the Defendants as to the significant health and safety risks posed by Depo-Provera, Plaintiff was unaware that Depo-Provera could cause the development of a serious and debilitating intracranial meningioma, as this danger was not known to Plaintiff, her Medical Providers, or the general public.

117.    Due to the absence of any instructions for how to identify and/or monitor Depo-Provera patients for potential intracranial meningioma-related complications, Plaintiff was unaware that Depo-Provera could cause serious, intracranial meningioma-related injuries, as this danger was not known to Plaintiff, her Medical Providers, or the general public.

118.    Given Defendants' conduct and deliberate actions designed to deceive Plaintiff, Plaintiff's Medical Providers, and the general public, with respect to the safety and efficacy of Depo-Provera, Defendants are estopped from relying on any statute of limitations defenses.

**Conduct Warranting Punitive Damages**

119.    For the reasons set forth above, Defendant Pfizer acted with a conscious disregard of the safety of Plaintiff and other consumers, many who were young and of lower socioeconomic status, who were subjected to high dose injections of 150 mg Depo-Provera with the known and/or knowable

risk of meningioma brain tumors which was generally accepted in the scientific community, while Defendant Pfizer had available its very own safer alternative medication, Depo Sub-Q Provera 104. Exemplary damages are warranted to punish and deter Defendant Pfizer and others from such conduct in the future.

## V.    CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### STRICT LIABILITY – PRODUCT DEFECT

120.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

121.    Depo-Provera is a medication prescribed for contraception and treatment of endometriosis, among other uses. Depo-Provera in fact causes serious and potentially debilitating intracranial meningioma, a brain tumor that can cause severe damage and require invasive surgical removal.

122.    Reasonable consumers, including Plaintiff and her Medical Providers, would not expect a contraceptive drug designed, marketed, and labeled for contraception to cause intracranial meningioma.

123.    At all relevant times, Defendants were engaged in the business of researching, developing, testing, manufacturing, labeling, marketing, distributing, and selling Depo-Provera to consumers as an injectable contraceptive. Defendants had a duty to produce pharmaceutical drugs free from defective conditions that were unreasonably dangerous to patients like Plaintiff who used the drugs as indicated.

124.    At the time the Depo-Provera left the Defendants' possession, it was dangerous beyond the extent to which Plaintiff or any ordinary consumer could reasonably expect.

125.    Defendants expected Depo-Provera to reach consumers like without substantial change from the condition in which it was manufactured, distributed, and sold. Depo-Provera reached Plaintiff without substantial change from the condition in which it was manufactured, distributed, and sold.

126.    Defendants have a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

127.    Defendants sold, marketed and distributed a product that is unreasonably dangerous for its normal, intended, and foreseeable use.

128.    Depo-Provera was unreasonably dangerous in its design and manufacture, because it used a higher dose of progestogen than was necessary for effective contraception, when Defendants knew that it was possible to produce lower dosage subcutaneous products with similar contraceptive effectiveness but lower risks of intracranial meningioma.

129.    Defendants wantonly and willfully failed to apprise the public, including the FDA, the medical community, Plaintiff, and her Medical Providers, of the greatly reduced risk of meningioma when injecting 150 mg Depo-Provera subcutaneously compared to the indicated method of intramuscular injection.

130.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Depo-Provera, a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the harm to which Plaintiff has been exposed.

131.    As a direct and proximate result of Defendants' conduct, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish, loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

132.    As a direct and proximate result of Defendants' conduct, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**SECOND CLAIM FOR RELIEF**
**STRICT LIABILITY – FAILURE TO WARN**

133.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

134.    At all relevant times, Defendants were engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera.

135.    Defendants placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

136.    Defendants, as manufacturers, distributers, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

137.    Defendants knew or should have known, based on published research, clinical testing, and other scientific knowledge that was available and accessible to them as experts, that Depo-Provera subjected patients to an unreasonable risk of developing intracranial meningioma.

138.    Defendants knew or should have known that the information they provided to patients and health care providers about risks associated with Depo-Provera was inadequate and misrepresented or omitted information and data that was material to patients and physicians.

139.    The information Defendants provided to the medical community, including to Plaintiff's Medical Providers, was inadequate to inform health care providers of the balance of risks and benefits associated with prescribing Depo-Provera for its intended use.

140.    Plaintiff and her Medical Providers did not have the same knowledge or expertise as Defendants, and received inadequate or no warning of the risk of intracranial meningioma associated with Depo-Provera use.

141.    Even if Depo-Provera were non-defective and not unreasonably dangerous when used for some purposes, Defendants' failure to warn health care providers and consumers about the risks of long-term use of Depo-Provera as an injectable contraceptive rendered the Product unreasonably dangerous to Plaintiff due to inadequate labeling.

142.    As a direct and proximate result of Defendants' failure to warn, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish, loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

143.    As a direct and proximate result of Defendants' failure to warn, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**THIRD CLAIM FOR RELIEF**
**NEGLIGENCE**

144.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

145.    At all relevant times, Defendants had a duty to exercise reasonable care in designing, labeling, manufacturing, testing, marketing, distributing, and selling Depo-Provera.

146.    Defendants breached their duty by marketing, distributing, and/or selling Depo-Provera when they knew or should have known that Depo-Provera created an unreasonable risk of harm to Plaintiff and to other individuals who used Depo-Provera as indicated or as Defendants could reasonably foresee.

147.    Defendants' negligent acts and omissions include:

a.    Designing, developing, formulating, manufacturing, promoting, distributing, and selling Depo-Provera without adequate pre- and post-market testing of the product;

b.    Designing, developing, formulating, manufacturing, promoting, distributing, and selling Depo-Provera without investigating the foreseeable risk that Depo-Provera use was associated with intracranial meningioma;

c.    Designing, developing, formulating, manufacturing, promoting, distributing, and selling Depo-Provera without disclosing the existence of medical research that demonstrated the link between progestin-based medication and meningioma;

d.    Continuing to manufacture and sell Depo-Provera while Defendants knew, or should have known, that Depo-Provera was unreasonably unsafe to users;

e.    Representing that Depo-Provera was safe for its intended use when in fact Defendants knew or should have known the product was not safe for its intended purpose;

f.    Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Depo-Provera so as to avoid the risk of serious harm associated with the use of Depo-Provera;

g.    Failing to design and manufacture Depo-Provera so as to ensure the drug was at least as safe and effective as other similar products;

h.      Failing to provide the medical community and the general public, including Plaintiff and her Medical Providers, accurate warnings about the risks of Depo-Provera or accurate instructions for safer use of the product; and

i.      Failing to sell a DMPA product with the lowest effective dose.

148.    A reasonable manufacturer of pharmaceutical products, under similar conditions, would not have engaged in these acts and omissions.

149.    As a direct and proximate result of Defendants' negligence, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish, loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

150.    As a direct and proximate result of Defendants' negligence, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**FOURTH CLAIM FOR RELIEF**
**NEGLIGENT FAILURE TO WARN**

151.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

152.    At all relevant times, Defendants knew or had reason to know that Depo-Provera was likely to be dangerous for users because of its association with intracranial meningioma.

153.    Defendants had no reason to believe that consumers, including Plaintiff, would realize the dangers that Depo-Provera posed to their health.

154.    Defendants had a continuing duty to exercise reasonable care to inform health care providers and consumers, including Plaintiff and her Medical Providers, of the dangerous condition of Depo-Provera and of the facts likely to make Depo-Provera dangerous.

155.    Defendants breached their duty by failing to exercise reasonable care to warn. Acts or omissions that constitute this breach of duty include, but are not limited to:

a.      Disseminating information to Plaintiff and her Medical Providers that was materially inaccurate and/or misleading;

b.      Failing to provide warnings or other information that accurately communicated to Medical Providers the risks of prescribing Depo-Provera to Plaintiff;

c.      Failing to provide instructions on ways to safely prescribe or use Depo-Provera to avoid injury;

d.      Failing to explain the mechanisms, modes, and types of adverse events associated with Depo-Provera;

e.      Failing to inform Plaintiff and her Medical Providers that there is a safer feasible alternative for contraception that is not associated with the same dangerous side effects.

f.      Failure to adequately warn of the risks that Depo-Provera could cause the development of intracranial meningioma, and of the potentially severe, debilitating, and irreversible injuries related to intracranial meningioma;

156.    Defendants knew or should have known of the risk and danger to patients associated with the indicated or reasonably foreseeable use of Depo-Provera.

157.    Plaintiff was prescribed Depo-Provera for its intended purpose and used Depo-Provera for its intended purpose.

158.    The warnings and information that Defendants gave were inaccurate, unclear, or incomplete, and failed to notify the medical community and general public, including Plaintiff and her Medical Providers, of the risks associated with Depo-Provera.

159.    Plaintiff and her Medical Providers were unaware of true risks associated with use of Depo-Provera, and reasonably relied upon the expertise and superior knowledge of Defendants.

160.    Had Plaintiff received adequate warnings regarding the risks of Depo-Provera, they would not have used Depo-Provera.

161.    As a direct and proximate result of Defendants' failure to warn, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish, loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

162.    As a direct and proximate result of Defendants' failure to warn, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENT DESIGN DEFECT**

163.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

164.    Defendants had a duty to exercise reasonable care and the duty required of an expert at all stages of researching, developing, designing, formulating, producing, testing, inspecting, packaging, labeling, marketing, promoting, distributing, and selling Depo-Provera. Defendants' duties included the duty to assure the safety of the product when it was used as intended or in a way reasonably foreseeable to Defendants, and the duty to provide the medical community and the general public, including Plaintiff and her Medical Providers, with accurate information and instructions for use of Depo-Provera.

165.    Defendants failed to exercise reasonable care and failed to perform the duty required of an expert, by the following acts and omissions:

a.    Failure to conduct adequate pre-clinical and clinical testing or post-marketing surveillance to determine the safety of Depo-Provera;

b.    Failure to use due care in researching, developing, designing, formulating, testing, and producing Depo-Provera, to avoid subjecting patients to increased risks of intracranial meningioma;

c.    Designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendants knew or should have known could subject Plaintiff to unreasonable risk of harm;

d.    Failing to use due care in researching, developing, designing, formulating, testing, and producing a safer alternative with a lower effective dose.

166.    Defendants' negligence and the unreasonable risk posed to patients who use Depo-Provera as indicated arise under circumstances precluding any other reasonable inference other than a defect in Depo-Provera.

167.    As a direct and proximate result of Defendants' negligence, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish,

loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

168.    As a direct and proximate result of Defendants' negligence, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**SIXTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**

169.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

170.    At all relevant times, Defendants negligently provided Plaintiff, her Medical Providers, the medical community, and the general public with false or incorrect information, or omitted or failed to disclose material information concerning Depo-Provera including, but not limited to, misrepresentations regarding the safety and known risks of Depo-Provera.

171.    Defendants' intent and purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and her Medical Providers, to falsely assure them of the quality of Depo-Provera and induce them to request, recommend, purchase, and/or prescribe Depo-Provera.

172.    Defendants had a duty to accurately and truthfully represent to the medical and health care community, and to the general public, including to Plaintiff and her Medical Providers, the known risks of Depo-Provera, including its propensity to cause intracranial meningioma and sequelae related thereto.

173.    Defendants failed to exercise ordinary care in making representations concerning Depo-Provera while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, by negligently misrepresenting Depo-Provera's significant risk of unreasonable and dangerous side effects.

174.    The safety and suitability of Depo-Provera, including its associations with intracranial meningioma, are material to consumers, patients, and health care providers, including to Plaintiff and her Medical Providers.

175.    At the time Plaintiff was prescribed and administered Depo-Provera, Plaintiff and her Medical Providers were unaware of Defendants' negligent misrepresentations and omissions.

Plaintiff and her Medical Providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of Depo-Provera.

176.    Plaintiff and her Medical Providers would not have used or prescribed Depo-Provera had the true facts not been concealed by the Defendants.

177.    Defendants had sole access to many of the material facts concerning the defective nature of Depo-Provera and its propensity to cause serious and dangerous side effects.

178.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish, loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

179.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**SEVENTH CLAIM FOR RELIEF**
**FRAUDULENT MISREPRESENTATION**

180.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

181.    At the time they manufactured, promoted, sold, and distributed Depo-Provera, Defendants knew or should have known, from clinical trials and case studies, about the potentially dangerous side effects of Depo-Provera.

182.    Defendants falsely misrepresented to consumers, patients, and health care providers, including to Plaintiff and her Medical Providers, that Depo-Provera was tested and found to be a safe and suitable option for contraception.

183.    Defendants knew or believed that Depo-Provera had not been thoroughly tested and found to be safe and suitable for use as an injectable contraceptive.

184.    Defendants knew that they did not have a sufficient factual basis to represent that Depo-Provera was thoroughly tested and found to be safe and suitable for use as an injectable contraceptive.

185.    Defendants knew that they did not have confidence in the accuracy of their representations that Depo-Provera was thoroughly tested and found to be safe and suitable for use as an injectable contraceptive.

186.    Defendants had a duty to disclose to consumers, patients, and health care providers, including to Plaintiff and her Medical Providers, the defective nature of Depo-Provera, including but not limited to, the biological mechanisms linking DMPA to meningioma, patients' increased risk of intracranial meningioma caused by exposure to DMPA, and the DMPA's consequent ability to cause severe and/or debilitating physical injury.

187.    The safety and suitability of Depo-Provera, including its associations with intracranial meningioma, are material to consumers, patients, and health care providers, including to Plaintiff and her Medical Providers.

188.    Defendants made misrepresentations and omissions relating to the safety of Depo-Provera with the intent that consumers, including Plaintiff, would rely upon such misrepresentations and omissions when deciding whether to use Depo-Provera.

189.    Defendants had sole access to many of the material facts concerning the defective nature of Depo-Provera and its propensity to cause serious and dangerous side effects.

190.    When they made these misrepresentations and omissions, Defendants knew that consumers, including Plaintiff, had no way to determine the truth of Defendants' representations or discover the material facts concealed and omitted therefrom.

191.    Plaintiff and her Medical Providers were unaware of the falsehood of Defendants' misrepresentations—and of the material facts omitted therefrom—and relied on Defendants' representations when using Depo-Provera.

192.    If Plaintiff and her Medical Providers had known about Depo-Provera's association with increased incidences of intracranial meningioma, they would not have used or prescribed Depo-Provera.

193.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish,

loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

194.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

**EIGHTH CLAIM FOR RELIEF**
**BREACH OF EXPRESS WARRANTY**

195.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

196.    At all relevant times, Defendants were engaged in the business of developing, manufacturing, labeling, marketing, selling, distributing, and promoting Depo-Provera.

197.    Defendants place Depo-Provera into the stream of commerce with the intent that Depo-Provera be prescribed by health care providers and used by consumers as an injectable contraceptive.

198.    Defendants or their authorized agents and representatives expressly warranted to Plaintiff and her Medical Providers that Depo-Provera was safe for its intended use as an injectable contraceptive. Defendants made these representations or caused these representations to be made through product labels, advertising campaigns, and communications by sales agents.

199.    Plaintiff and her Medical Providers reasonably relied on Defendants' affirmations of fact, promises, and descriptions of Depo-Provera. These affirmations of fact, promises, and descriptions were a basis of the bargain that Plaintiff made with Defendants.

200.    Depo-Provera failed to conform to Defendants' affirmations of fact, promise, and descriptions because it is defective and unsafe, and causes intracranial meningioma. Defendants' sale and distribution of Depo-Provera therefore breached an express warranty.

201.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff developed intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish, loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of future related injury.

202.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff incurred costs for medical treatment, including costs for treating future related injuries.

1

2

### NINTH CLAIM FOR RELIEF
### BREACH OF IMPLIED WARRANTY

3        203.    Plaintiff repeats and re-alleges the factual allegations above as if fully alleged herein.

4        204.    Defendants regularly develop, manufacture, distribute and sell Depo-Provera and other

5    similar pharmaceutical products. Defendants are merchants of Depo-Provera within the meaning of the

6    Uniform Commercial Code, Cal. Com. Code § 2104.

7        205.    Defendants knew that consumers, including Plaintiff, use Depo-Provera for the

8    particular purpose of an injectable contraceptive, and rely on Defendants' skill and judgment to provide

9    suitable goods.

10        206.    Defendants impliedly warranted that Depo-Provera was merchantable, fit for ordinary

11    use as a contraceptive, and conformed to promises and affirmations of fact made on the product label

12    or container.

13        207.    In deciding to purchase and use Depo-Provera, Plaintiff relied on Defendants' judgment

14    that it was merchantable and fit for its ordinary purpose.

15        208.    In deciding to purchase and use Depo-Provera, Plaintiff relied on Defendants' judgment

16    that it was merchantable and fit for the particular purpose as an injectable contraceptive.

17        209.    Contrary to Defendants' implied warranty, Depo-Provera was unfit for its ordinary

18    purpose and Plaintiff's particular purpose because it is defective and unsafe when used as an injectable

19    contraceptive and causes intracranial meningioma. Defendants' sale and distribution of Depo-Provera

20    therefore breached an implied warranty.

21        210.    As a direct and proximate result of Defendants' breach of warranty. Plaintiff developed

22    intracranial meningioma, causing her physical injury, disability, pain and suffering, mental anguish,

23    loss of earnings, loss of consortium, loss of capacity for the enjoyment of life, and a heightened risk of

24    future related injury.

25        211.    As a direct and proximate result of Defendants' breach of warranty, Plaintiff incurred

26    costs for medical treatment, including costs for treating future related injuries.

27

28

COMPLAINT AND DEMAND FOR JURY TRIAL

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all other similarly situated persons, prays for relief as follows:

A.    Compensatory and punitive exemplary damages in an amount to be determined at trial, including, but not limited to:

a.    General Damages for severe physical pain, mental suffering, inconvenience, and loss of the enjoyment of life;

b.    Special Damages, including all expenses, incidental past and future expenses, medical expenses, and loss of earnings and earning capacity;

B.    Pre- and post-judgment interest as permitted by law;

C.    Attorneys' fees, costs, and litigation expenses; and

D.    Other relief as the Court shall deem just and proper.

## VII.    DEMAND FOR TRIAL BY JURY

A jury trial is demanded on all claims so triable.

Dated: December 4, 2024                **LYNCH CARPENTER, LLP**

By:    _/s/ (Eddie) Jae K. Kim_
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
117 E Colorado Blvd, Ste 600
Pasadena, CA 91105-3712
Telephone:    (213) 723-0707
Facsimile:    (858) 313-1850

Kelly K. Iverson (*pro hac vice forthcoming*)
kelly@lcllp.com
1133 Penn Ave., 5th Floor
Pittsburgh, PA 15222
Telephone:    (412) 322-9243
Facsimile:    (412) 231-0246

*Attorneys for Plaintiff*